UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FIVE STAR GOURMET FOODS, INC.,
et al.,

        Plaintiffs,

   v.

FRESH EXPRESS, INC., et al.,

        Defendants.

Case No. 19-cv-05611-PJH

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS**

Re: Dkt. No. 20

Defendant Fresh Express Incorporated's ("Fresh Express") motion to dismiss came on for hearing before this court on January 15, 2020. Plaintiffs Five Star Gourmet Foods, Inc. ("Five Star") and Direct Pack, Inc. ("Direct Pack") appeared through their counsel, Chris Lee. Defendant appeared through its counsel, Gia Cincone. Codefendant Proseal America, Inc. ("Proseal") appeared through its counsel, Justin Sobaje. Codefendant Plastic Ingenuity, Inc. ("Plastic Ingenuity") appeared through its counsel, Jason Wu. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows, for the reasons stated at the hearing and for the following reasons.

## BACKGROUND

On September 5, 2019, plaintiffs filed the original complaint in this action against defendants Fresh Express, Proseal, Plastic Ingenuity, John Olivo, Kenneth Dively, Fabian Pereira, and Doe defendants. Dkt. 1. Plaintiffs filed an amended complaint on October 31, 2019. First Amended Compl., Dkt. 10 (the "FAC").

The FAC asserts 10 causes of action: (1) fraud and deceit (against Fresh Express

and Does); (2) misappropriation of trade secrets (against Fresh Express, Proseal, and Does); (3) design patent infringement (against Fresh Express, Plastic Ingenuity, and Does); (4) active inducement of patent infringement (against Proseal and Does); (5) trade dress infringement (against Fresh Express, Plastic Ingenuity, and Does); (6) active inducement of trade dress infringement (against Proseal, Plastic Ingenuity, and Does); (7) common law unfair competition (against Fresh Express, Proseal, Plastic Ingenuity, and Does); (8) statutory unfair competition (against all defendants); (9) breach of contract (against Fresh Express, Proseal, Olivo, Dively, and Pereira); and (10) intentional interference with contract (against Fresh Express).

Five Star is a company that sells pre-packaged salads in plastic containers.[1] Those plastic containers are configured with various compartments such that the salad's ingredients are kept separate in the packaging. Fresh Express is a subsidiary of Chiquita Brands, LLC. It also sells pre-packaged snacks and salads, and it also uses plastic packaging that divides salad ingredients into segregated compartments while packaged. Five Star alleges that Fresh Express and its executives entered into partnership discussions with Five Star under false pretenses, but they never intended to partner with Five Star. Instead, they used those discussions to purloin valuable business information.

In 2016, Fabian Pereira, the Head of Marketing for Fresh Express, met Five Star's CEO, Tal Shoshan. Pereira sent an email to Shoshan saying that his company was interested in exploring potential business relations. In follow-on communications, Pereira made clear that Fresh Express was interested in exploring how the two companies could "develop a fruitful partnership together." FAC ¶ 16 & Ex. 2. When Pereira proposed that he, Olivo, and Dively meet with Shoshan privately and tour Five Star's production facilities as part of these partnership discussions, Five Star agreed. Prior to the tour, Pereira, Olivo, and Dively met with Shoshan and asked questions about Five Star's marketing strategy, product composition, packaging, and manufacturing logistics.

---

[1] For the purposes of this motion, this court takes and recounts plaintiffs' well-pled allegations as true.

The Fresh Express visitors toured Five Star's Florida facility in May of 2017. All of the visitors signed non-disclosure agreements before entering the facility, as is required of all visitors to Five Star. Five Star showed them its production process, how it staffs its production lines, the equipment and equipment vendors it uses, and provided a comprehensive view of Five Star's entire salad bowl production process, including how it set up its assembly lines.

Shortly after Fresh Express toured Five Star's facility, Henrique Cutrale, of the Cutrale family that owns Fresh Express and parent company Chiquita, met with Shoshan and made it clear that Fresh Express was not interested in any partnership with Five Star. He said that Chiquita/Fresh Express was strictly a family-owned business and would never, under any circumstances, partner with others. Instead, he said that his company was only willing to discuss an outright purchase of Five Star. On June 27, 2018, Cutrale told Shoshan that he had $80 million allocated to purchase new equipment to compete with Five Star.

Plaintiffs allege that Fresh Express has since used Five Star's secret business information and publicly-available information to copy every aspect of Five Star's salad bowl products, from the added extra toppings which Five Star was known for, to the type of ingredients, to Five Star's packaging and labeling design. Fresh Express virtually duplicated the look of Five Star's product line, instead of using their previous look and feel, in order to misappropriate Five Star's goodwill and customer base as the leading premium salad brand.

Defendant Proseal has long been Five Star's supplier for the packaging machinery that seals its salad-bowl products. Proseal is subject to a non-disclosure agreement as part of its relationship with Five Star. As part of its efforts to misappropriate Five Star's products and packaging, Fresh Express convinced Proseal to sell them similar equipment and create a manufacturing tool set that is virtually indistinguishable from the tool set used for Five Star's packaging equipment. As a result, Fresh Express can make packaging that is virtually indistinguishable from Five Star's. Fresh Express uses that

3

toolset to confuse consumers into believing they are purchasing products manufactured by Five Star, or a company affiliated with Five Star.

The present motion to dismiss is brought by a single defendant, Fresh Express. It seeks to dismiss all claims asserted against it—the First, Second, Third, Fifth, Seventh, Eighth, Ninth, and Tenth causes of action in the FAC. Defendant has also requested that the court take judicial notice of certain images of product packaging. See RJN, Dkt. 21.

## DISCUSSION

### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558–59 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

4

Review is generally limited to the contents of the complaint, although the court can also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document"). The court may also consider matters that are properly the subject of judicial notice (Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001)), exhibits attached to the complaint (Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)), and documents referenced extensively in the complaint and documents that form the basis of the plaintiff's claims (No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003)).

For plaintiffs' claims that sound in fraud, the complaint must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009). Rule 9(b) requires a party alleging fraud or mistake to state with particularity the circumstances constituting fraud or mistake. "To satisfy Rule 9(b)'s particularity requirement, the complaint must include an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Depot, Inc. v. Caring for Montanans, Inc., 915 F.3d 643, 668 (9th Cir. 2019) (internal quotation marks omitted). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Kearns, 567 F.3d at 1124. Plaintiffs must also offer "an explanation as to why the statement or omission complained of was false or misleading." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), superseded by statute on other grounds as stated in SEC v. Todd, 642 F.3d 1207, 1216 (9th Cir. 2011).

**B.     Analysis**

**1.     First Claim:  Fraud**

"The elements of a cause of action for fraud in California are:

'(a) misrepresentation (false representation, concealment, or *nondisclosure*);

(b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance;

(d) justifiable reliance; and (e) resulting damage.'" <u>Kearns</u>, 567 F.3d at 1126 (quoting

<u>Engalla v. Permanente Med. Group, Inc.</u>, 15 Cal. 4th 951, 974 (1997)).  The pleading

requirements of Rule 9(b) apply, at least with respect to the first element of the fraud

claim.

**a.     Misrepresentation**

Fresh Express argues that plaintiffs allege only a single, noncommittal statement

in an email generally referring to Fresh Express's intent to discuss the possibility of a

future partnership.  Plaintiffs argue that defendants claimed to be interested in forming a

partnership even though they never had any interest in doing so.  Plaintiffs also argue

that the FAC contains additional allegations of misrepresentations, other than the single

email pled.

With respect to the latter argument, the court is not persuaded that plaintiffs have

pled any fraudulent statement with the requisite particularity, other than the statements

included in Exhibit 2 to the FAC.  <u>See</u> FAC, Ex. 2 at 1 ("I have spoken to our owners and

leadership team.  They would like to continue this conversation with you and see how we

develop a fruitful partnership together.").  Rule 9(b)'s pleading requirements apply to

allegedly-fraudulent statements.  Such statements must be pled with specificity.  Plaintiffs

argue that the email included as Exhibit 2 to the FAC is merely an example of a

fraudulent statement, and that the complaint generally pleads that Fresh Express made

other representations to the effect that it was interested in a strategic partnership.  <u>See</u>

Opp., Dkt. 29 at 2–4 (citing FAC ¶¶ 16, 26).  Plaintiffs also argue that the parties held a

number of meetings during which defendants made additional misrepresentations not

identified in the FAC.  <u>See</u> <u>id.</u> at 4.  Such general allegations, referencing unspecified

6

misrepresentations, do not satisfy Rule 9(b)'s pleading requirements.[2]

Given that plaintiffs have adequately alleged a single representation, the court is left to determine whether it, standing alone, adequately pleads a claim for fraud. Defendant argues that the complaint fails to identify what is false or misleading about the statement.[3]

Plaintiffs allege that Pereira stated he had "spoken to [Fresh Express's] owners and leadership team," and those individuals "would like to continue this conversation with you and see how we develop a fruitful partnership together." FAC, Ex. 2. That same email proposed a date for Fresh Express to tour Five Star's facilities, and dates for other meetings. It closed by stating that "Henry Cutrale the owner will be back from London and spend rest of the day with us [following a May 19 meeting] and we can explore details of the relationship." Id. at 2.

The complaint alleges that Pereira claimed to have spoken with Fresh Express's owners, and that the owners specifically were interested in developing a partnership with Five Star. The complaint alleges that Pereira's statements were false because Fresh Express never had any desire to form a partnership—even at the time the email was sent—and made knowingly-false statements about its desire to do so solely to gain access to Five Star's facilities. Accordingly, the false statement as alleged concerns whether Fresh Express had an actual desire to form a partnership with Five Star, not whether Fresh Express made an actionable promise to enter into any specific business relationship. Plaintiffs allege that those statements were false when made because Fresh Express's owners and leadership team had a policy that they would never partner

[2] Plaintiffs' arguments do support granting leave to amend their complaint in order to allege additional misrepresentations with specificity.

[3] Defendant also argues that it offered to purchase Five Star subsequent to the alleged statement, so the court should make a factual finding that the FAC's allegedly-fraudulent statement to explore a partnership was true. Plaintiffs dispute defendant's characterization of that factual question—namely, whether the allegedly-false statement was true. Because the court must accept plaintiffs' well-pleaded facts as true for the purposes of this motion, the court cannot dismiss plaintiffs' claim based on defendant's alternative characterization of events.

with plaintiffs. Knowing they would never partner with plaintiffs, defendant lied about its desire to partner with Five Star in an effort to pursue partnership discussions as a ruse to observe plaintiffs' proprietary production facilities.

Plaintiffs allege that the statement was false when made based on Fresh Express's owner's later statement that the company "would never, under any circumstances, partner with others" and would only "discuss an outright purchase of Five Star." FAC ¶ 20. This adequately pleads a misrepresentation under Rule 9(b). See In re GlenFed, Inc. Sec. Litig., 42 F.3d at 1549 & n.9 (to plead falseness, the plaintiff must provide "an explanation as to why the disputed statement was untrue or misleading when made[,]" which may be done "by pointing to inconsistent contemporaneous statements or information" or a "later statement by the defendant along the lines of 'I knew it all along'"); see also Muse Brands, LLC v. Gentil, Case No. 15-cv-01744-JSC, 2015 WL 4572975, at *4 (N.D. Cal. July 29, 2015) (circumstantial evidence of falseness may include the "shortness of time between later revealed truth and prior statements"); see generally Richardson v. Reliance Nat. Indem. Co., Case No. 99-cv-2952-CRB, 2000 WL 284211, at *4 (N.D. Cal. Mar. 9, 2000) ("While mere failure to perform on a contract does not constitute fraud, a promise made *without the intention to perform* can be actionable fraud").

Plaintiffs adequately allege a misstatement by alleging that a competitor stated it was interested in forming a partnership solely as a ruse to purloin confidential, competitive information, while at all times knowing that it was never interested in forming a partnership under any circumstances.

### b. Scienter & Intent to Defraud

Defendant argues that the complaint does not allege that the speaker, Pereira, knew that his statement was false when made, so the "complaint contains no allegation of scienter on Mr. Pereira's part." Reply, Dkt. 32 at 3.[4]

---

[4] Defendant also argues that the alleged misrepresentation was not false—which, again, is a factual dispute that the court may not resolve in defendant's favor on this motion.

"[F]or claims of fraud against a principal, as here, the common law of agency recognizes a limitation on respondeat superior. Specifically, for claims of fraud respondeat superior does not apply if one agent makes a statement, believing it to be true, while another agent knows facts that falsify the other agent's statement. In such a scenario, no agent of the company has committed fraud because liability for fraud requires that the defendant made a material misstatement *with an intent to deceive.* The result of this limitation is that liability for fraud cannot be imputed to a corporation without evidence that an agent of the corporation who participated in making the challenged statements did so with scienter, i.e., with intent, knowledge of, or deliberate reckless with respect to the statements' falsity." In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., Case No. MDL 2672 CRB (JSC), 2017 WL 6041723, at *8 (N.D. Cal. Dec. 6, 2017) (internal quotation marks and citations omitted). "[T]he required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency." Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 367 (5th Cir. 2004); accord In re Volkswagen, 2017 WL 6041723, at *9; see also Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 708 (7th Cir. 2008) ("To establish corporate liability for a violation of Rule 10b–5 requires 'look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'").

Plaintiffs allege that "Fabian Pereira is the Vice President, Marketing for Fresh Express[.]" FAC ¶ 8. They also allege that "Henrique Cutrale, of the Cutrale family that owns Fresh Express and parent company Chiquita, . . . made it clear that Fresh Express was not interested in any strategic partnership with Five Star. He said that Chiquita/Fresh Express was strictly a family-owned business and would never, under any

circumstances, partner with others.  Instead, he said that his company was only willing to discuss an outright purchase of Five Star."  FAC ¶ 20.

Plaintiffs fail to allege that the only person who made an adequately-alleged statement (Pereira) acted with scienter or intent to defraud.  They allege that Fresh Express's owner, Cutrale, stated that the company "would never, under any circumstances, partner with others" and would only "discuss an outright purchase of Five Star."  FAC ¶ 20.  But they do not allege any misrepresentation that meets the Rule 9(b) pleading standard made by Cutrale.  And they do not make any allegation that would support imputing Cutrale's knowledge that Fresh Express would never partner with Five Star to Pereira.

Accordingly, there is no allegation that Pereira knew that his statement was false when making it, or that he made it with an intent to deceive plaintiffs.  Because the only misrepresentation adequately alleged is Pereira's statement, plaintiffs have failed to adequately state a claim for fraud.  Plaintiffs' claim for fraud is DISMISSED WITH LEAVE TO AMEND as to defendant Fresh Express.

### 2.    Second Claim:  Misappropriation of Trade Secrets

"To state a claim for trade secret misappropriation under the DTSA [Defend Trade Secrets Act] and the CUTSA [California Uniform Trade Secrets Act], a plaintiff must allege that:  (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff."  Alta Devices, Inc. v. LG Elecs., Inc., 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (internal quotation marks omitted).

### a.    Whether Five Star Owned A Trade Secret

Defendant argues that plaintiffs plead only general categories of things that could potentially be protectable trade secrets, but they fail to plead what specific trade secrets were misappropriated.

The DTSA defines "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans,

compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]"  18 U.S.C. § 1839(3).

The CUTSA defines a "[t]rade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:  (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  "'Information' has a broad meaning under the [C]UTSA."  Altavion, Inc. v. Konica Minolta Sys. Lab., Inc., 226 Cal. App. 4th 26, 53 (2014).  "The definition of trade secret is unlimited as to any particular class or kind of matter and may be contrasted with matter eligible for patent or copyright protection, which must fall into statutorily defined categories.  A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.  It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device or list of customers."  Id. (internal quotation marks and citations omitted).

"[C]ourts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets."  Autodesk, Inc. v. ZWCAD Software Co., Cas No. 14-cv-01409-EJD, 2015 WL 2265479, at *6 (N.D. Cal. May 13, 2015) (internal quotation marks omitted).  Accordingly, "a plaintiff need not

spell out the details of the trade secret," but it must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." Alta Devices, 343 F. Supp. 3d at 881–82 (internal quotation marks omitted); accord Autodesk, 2015 WL 2265479, at *5; Vendavo, Inc. v. Price f(x) AG, Case No. 17-cv-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018); MedioStream, Inc. v. Microsoft Corp., 869 F. Supp. 2d 1095, 1113 (N.D. Cal. 2012) ("The complaint need not 'spell out the details of the trade secret' but must identify the trade secret with sufficient particularity to give defendants 'reasonable notice of the issues which must be met at the time of trial and to provide reasonable guidance in ascertaining the scope of appropriate discovery.'").

For example, allegations that set out "purported trade secrets in broad, categorical terms" that are merely "descriptive of the types of information that generally *may* qualify as protectable trade secrets" are insufficient to state a claim. Vendavo, 2018 WL 1456697, at *3–4 (rejecting the following allegations as insufficiently-specific: "source code, customer lists and customer related information, pricing information, vendor lists and related information, marketing plans and strategic business development initiatives, 'negative knowhow' learned through the course of research and development, and other information related to the development of its price-optimization software, including ideas and plans for product enhancements"); see also Space Data Corp. v. X, Case No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) (rejecting the following allegations as insufficiently-specific: "data on the environment in the stratosphere" and "data on the propagation of radio signals from stratospheric balloon-based transceivers").

Plaintiffs allege that Fresh Express learned about and observed Five Star's processes while under an NDA. FAC ¶ 18. Under that NDA, defendant's employees learned about "marketing strategy, product composition, packaging and manufacturing logistics." Id. Also, "Five Star showed [Fresh Express employees] its production process, how it staffs its production lines, the equipment and equipment vendors it uses,

and provided a comprehensive view of Five Star's entire salad bowl production process. For example, only Five Star knows how to set up its assembly lines and what order of operations will most efficiently make its product. Only Five Star knows the complicated order of machinery and live personnel that provides its time-tested method for efficiently producing its salads." Id.

Certainly, some of plaintiffs' allegations vaguely describe categories of things that might contain trade secret information, rather than trade secrets themselves. For example, plaintiffs' allegations that defendant took their "marketing strategy, product composition, packaging and manufacturing logistics" are all too vague to adequately allege a trade secret claim. Id. Additionally, some of plaintiffs' arguments describing their trade secrets are confusingly based on publicly-available information—for example, "the amount of toppings in each salad bowl, and the types of ingredients used in each bowl[.]" Opp. at 7.

But plaintiffs' complaint also includes more specific allegations. Five Star alleges that it showed defendants "how it staffs its production lines, the equipment and equipment vendors it uses," and the order of operations, machinery, and live-personnel it uses on its assembly line. See FAC ¶ 18. Plaintiffs also allege that they have an interest in the design of the toolset used in the equipment that makes their packaging. See FAC ¶ 23. The complaint's level of detail is therefore sufficient to ascertain at least the boundaries within which the secrets lie and the scope of appropriate discovery. Plaintiffs therefore adequately allege that they owned a trade secret.

### b.      Whether Defendant Misappropriated A Trade Secret

Defendant argues that Five Star does not explain how Fresh Express gained access to Five Star's alleged trade secrets, beyond touring its production facility and asking questions about Five Star's manufacturing and production process. Defendant also argues that plaintiffs do not allege which trade secrets Fresh Express is now using.

With respect to the first argument, plaintiffs allege that Fresh Express gained access to plaintiffs' trade secrets by asking probing questions and touring their facilities

after entering into nondisclosure agreements.  See FAC ¶¶ 18, 20, 22, 26–29, 33–35.

Those allegations are the core of the complaint.  The complaint could hardly be more

clear in describing how Fresh Express gained access to Five Star's trade secrets.

Second, Fresh Express argues that the complaint fails to allege which specific

trade secrets it is using.  Plaintiffs allege that the organization of Five Star's production

process is valuable (FAC ¶¶ 18–19), that Fresh Express used $80 million to purchase

equipment to compete with Five Star (FAC ¶ 21), and that Fresh Express "used Five

Star's secret business information and publicly available information to copy every aspect

of Five Star's patented salad bowl products, from the added extra toppings which Five

Star was known for, to the type of ingredients, to the packaging and labeling design

which made Simply Fresh a very successful product line" (FAC ¶ 22).  They also allege

that Proseal (the maker of plaintiffs' plastic containers) created a manufacturing tool set

for Fresh Express that is virtually indistinguishable from the tool set used for Five Star's

packaging equipment.  FAC ¶ 23.

The court finds that, taken together, plaintiffs' allegations adequately allege that

Fresh Express misappropriated a protected trade secret.  In addition to alleging a specific

investment in equipment designed to copy protected elements of Five Star's production

facility, plaintiffs have specifically alleged that Fresh Express obtained a protected toolset

design from Proseal that is used to create Five Star's packaging.  FAC ¶ 23.

### c.    Resulting Damage

Fresh Express argues that the complaint does not identify what specific elements

of plaintiffs' intellectual property it allegedly learned or has used, such that it has not

adequately alleged how Five Star has been harmed as a result.

As with plaintiffs' attempts to allege what particular trade secrets it possessed,

many of their allegations are vague on this point or merely describe what Fresh Express

hoped to learn (rather than what it learned).  See, e.g., FAC ¶¶ 26–29.  Still, the

complaint adequately alleges that defendant learned about specific, proprietary

information regarding Five Star's production process.  See, e.g., FAC ¶¶ 18–19.

Defendant also argues that, even if plaintiffs adequately allege what intellectual property was stolen, they have not alleged how that theft caused harm. But plaintiffs allege that, by stealing the proprietary information, defendant entered the ready-made salad market much more cheaply, "ramp[ed] up much more quickly, and compete[d] with Five Star far more effectively" than it otherwise would have been able to do. See FAC ¶¶ 19–22. The complaint sets out a theory of harm sufficient to survive defendant's motion to dismiss based on those allegations.

For the foregoing reasons, defendant's motion to dismiss plaintiffs' second cause of action for misappropriation of trade secrets as alleged against Fresh Express is DENIED.

### 3.       Third Claim:  Design Patent Infringement

Defendant argues that the products at issue in this action are too different to support a claim for design patent infringement, and the court can make that determination on this motion by comparing images of the products. Plaintiffs argue that this claim presents a factual question inappropriate for resolution on this motion to dismiss.

The Federal Circuit has established "five elements of a patent infringement pleading, to (i) allege ownership of the patent, (ii) name each defendant, (iii) cite the patent that is allegedly infringed, (iv) state the means by which the defendant allegedly infringes, and (v) point to the sections of the patent law invoked. . . . [T]his is enough detail to allow the defendants to answer and . . . Rule 12(b)(6) requires no more." Hall v. Bed Bath & Beyond, Inc., 705 F.3d 1357, 1362 (Fed. Cir. 2013) (internal quotation marks omitted).

"Design patent infringement is a question of fact, which a patentee must prove by a preponderance of the evidence. . . . [T]he 'ordinary observer' test should be the sole test for determining whether a design patent has been infringed. The patentee must establish that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design. . . . The ordinary observer test similarly applies in cases where the patented design incorporates

numerous functional elements.  In evaluating infringement, we determine whether the

deception that arises is a result of the similarities in the overall design, not of similarities

in ornamental features in isolation."  Richardson v. Stanley Works, Inc., 597 F.3d 1288,

1295 (Fed. Cir. 2010) (internal quotation marks and citations omitted); accord Ethicon

Endo-Surgery, Inc. v. Covidien, Inc., 796 F.3d 1312, 1335 (Fed. Cir. 2015) ("A design

patent is infringed '[i]f, in the eye of an ordinary observer, giving such attention as a

purchaser usually gives, two designs are substantially the same, if the resemblance is

such as to deceive such an observer, inducing him to purchase one supposing it to be

the other.'").

Resolution of a claim for design patent infringement may require the finder of fact

to be familiar with the prior art.  "In some instances, the claimed design and the accused

design will be sufficiently distinct that it will be clear without more that the patentee has

not met its burden of proving the two designs would appear 'substantially the same' to the

ordinary observer. . . .  In other instances, when the claimed and accused designs are not

plainly dissimilar, resolution of the question whether the ordinary observer would consider

the two designs to be substantially the same will benefit from a comparison of the

claimed and accused designs with the prior art . . . .  [D]ifferences between the claimed

and accused designs that might not be noticeable in the abstract can become significant

to the hypothetical ordinary observer who is conversant with the prior art."  Egyptian

Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 678 (Fed. Cir. 2008).

Defendant points out that in a nonprecedential opinion, the Federal Circuit has

suggested that an accused design may be sufficiently distinct from a patented design in

certain instances such that it could be clear based on the pleadings that the patentee

cannot satisfy the ordinary observer test.  See Anderson v. Kimberly-Clark Corp., 570 F.

App'x 927 (Fed. Cir. 2014) (affirming dismissal of claim for design patent infringement on

motion for judgment on the pleadings).

Here, defendant argues that an ordinary observer would not find the designs to

appear substantially the same.  Defendant cites only two non-precedential cases

16

resolving this type of factual question on the pleadings. The court declines to resolve this inherently factual question on this motion to dismiss. Moreover, even were the court to consider the merits of defendant's argument and make a factual determination, the parties have presented competing factual descriptions that the court is not equipped to resolve based on the papers before it—especially given that familiarity with the prior art is potentially relevant to the determination, and the parties have not adequately addressed its impact.[5]

For the foregoing reasons, defendant's motion to dismiss plaintiffs' third cause of action for design patent infringement as alleged against Fresh Express is DENIED.

### 4. Fifth Claim: Trade Dress Infringement

---

[5] Defendant requests that, pursuant to Federal Rule of Evidence 201, the court take judicial notice of certain photographs it argues "are true and correct images of the accused packaging in the FAC's Third Cause of Action for design patent infringement." Dkt. 21 at 1. As an initial matter, the court would not be equipped to resolve the factual issues presented by defendant's motion to dismiss the design patent infringement claim even if it took judicial notice of those materials. Moreover, the mechanism by which defendant asks the court to take notice of the photographs allows the court to "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Defendant's request fails, because the appearance of the products is not generally known in the district, and the images are sources whose accuracy can reasonably be questioned. In fact, plaintiffs do question the sources (Dkt. 31 at 3–4), and they do so reasonably. The source of the images is entirely unexplained, and they were submitted to the court without a sworn declaration explaining any information that would allow the court to understand their reliability—e.g., how they were taken, whether they are accurate and faithful reproductions, when they were taken, where the subjects of the images were sourced, etc. To the extent defendant requests judicial notice pursuant to the doctrine of incorporation by reference, that too fails because that the doctrine applies only where "the document's authenticity is not in question" (Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010)), and plaintiffs contest the authenticity of the images (Dkt. 31 at 3–4). Defendant's request for judicial notice is accordingly DENIED.

Plaintiffs request that the court take judicial notice of the existence of an order issued by a judge in the Central District of California and the complaint that was filed in that action. Plaintiffs do not ask the court to take notice of the truth of the facts contained in those documents—merely their existence. Dkt. 30 at 2. Although the court finds the request as superfluous as requesting that the court to take judicial notice of any other district court order cited in the parties' briefs, the request is GRANTED.

"Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir. 2001) (internal quotation marks omitted).  In order to prove a claim for infringement of unregistered trade dress, Five Star must prove "(1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that [Fresh Express's] product or service creates a likelihood of consumer confusion." Id. at 1258 (footnote omitted).

First, defendant argues that plaintiffs have not adequately identified the elements of the alleged trade dress.  Second, defendant argues that plaintiffs inappropriately base their claim on functional elements of the design.

### a.      Specificity of the Pleading

Defendant challenges the specificity of the pleading with respect to what precise elements of Five Star's product constitutes its trade dress.

"Trade dress protection applies to a combination of any elements in which a product is presented to a buyer, including the shape and design of a product." Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1145 (9th Cir.2009) (internal quotation marks omitted).  "Trade dress involves 'the total image of a product and may include features such as size, shape, color or color combination, texture, graphics, or even particular sales techniques.'" Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 808 n.13 (9th Cir. 2003) (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 765 n.1 (1992)).  "In evaluating a trade dress claim, a court must not focus on individual elements, 'but rather on the overall visual impression that the combination and arrangement of those elements create.'" Sleep Sci. Partners v. Lieberman, Case No. 09-cv-04200-CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010) (quoting Clicks Billiards, 251 F.3d at 1259).  "Trade dress is the composite tapestry of visual effects." Clicks Billiards, 251 F.3d at 1259.  Even though the particular features are not

United States District Court
Northern District of California

1  determinative, "[a] plaintiff should clearly articulate its claimed trade dress to give a

2  defendant sufficient notice." Sleep Sci. Partners, 2010 WL 1881770, at *3.

3  　　　Defendant primarily relies on Sleep Sci. Partners and Autodesk, Inc. v. Dassault

4  Systemes SolidWorks Corp., Case No. 08-cv-04397-WHA, 2008 WL 6742224 (N.D. Cal.

5  Dec. 18, 2008) to argue that plaintiffs must plead the particular elements that constitute

6  the allegedly-infringed trade dress.  But defendant would have the court read much more

7  into the AutoDesk order than its text supports.  The holding of that order was limited to

8  finding that the plaintiff had not alleged whether or not its "tagline" and mark were even

9  part of the "total image" constituting its product's trade dress—not that such elements

10  would be insufficient if alleged.  Autodesk, 2008 WL 6742224, at *5 (dismissing with

11  leave to amend to "provide more detail and clarify" the claim, because it was "unclear

12  whether Autodesk contends the mark and tagline are also part of the total image, design,

13  and appearance of the product that constitutes its trade dress").

14  　　　The Sleep Sci. Partners order is more relevant.  That order described an

15  amorphous claim of trade dress protection in a website, telephone ordering system, and

16  television commercial.  That order dismissed the trade dress claim with leave to amend

17  where the pleadings claimed that a website was protected based on the ability to view a

18  commercial on it, the inclusion of user testimonials, the inclusion of a screening

19  questionnaire, and the layout of text, graphics, and hyperlinks on the site.  (The

20  telephone ordering system was separately analyzed and dismissed because the only

21  element for which protection was claimed was a questionnaire, which is a common

22  feature.)  The trade dress claim based on the television commercial was also dismissed

23  with leave to amend because the description was too vague—an introduction with sounds

24  of loud snoring, graphics illustrating an opening human airway, and user testimonials.

25  　　　Plaintiffs' complaint in this case is much more specific than the cases defendant

26  relies upon.  Paragraph 55 of Five Star's complaint specifies distinctive elements of its

27  product that contribute toward an overall appearance deserving of trade-dress protection.

28  It lists "a. A rounded square transparent plastic bowl containing salad ingredients,

19

particularly lettuce or other greens; b. A companion transparent plastic insert containing a central receptacle to hold the salad dressing cup and several arcuate, segmental receptacles, positioned circumferentially around the central receptacle, each of the receptacles containing various colorful salad toppings; [and] c. An elongated generally rectangular plastic band overwrap or sleeve the overwrap or sleeve being tensioned around the bowl, with said plastic band or sleeve overwrap containing a particular look and feel through its use of font, colors and overall design that provides a vertical billboard as well as allowing for all the salad toppings to be viewed without being obstructed by the band or sleeve[.]"  FAC ¶ 55.  Moreover, plaintiffs attached photographs of Five Star's (and Fresh Express's) salads as a companion to the descriptions provided in the FAC. See FAC, Ex. 5.

Five Star's allegations give Fresh Express sufficient notice of what constitutes the allegedly-protected trade dress.  For example, Fresh Express alleges that the particular shape of a clear plastic bowl, the fact that there are clear segmented receptacles arranged in a circle around a central bowl, and a vertical strip of paper wrapped around the center of the product (allowing the product to be seen on either side) with a distinctive font combine to form its trade dress.  Plaintiffs are not required to allege an element-to-element comparison with the accused product to allege infringement, but instead must allege a composite tapestry of visual effects that gives defendant sufficient notice of what is allegedly protected in the claim.  That, they have done.

       **b.**    **Whether Plaintiffs Impermissibly Rely on Functional Elements**

Defendant argues that the elements plaintiffs identify are functional, which cannot form the basis of trade dress protection.

"[T]rade dress protection cannot be asserted for any functional features of a product."  Millennium Labs., Inc. v. Ameritox, Ltd., 817 F.3d 1123, 1126 (9th Cir. 2016). Functional features are those that are "essential to the use or purpose of the article or . . . affect[] the cost or quality of the article."  Id. at 1129; accord Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n.10 (1982).  Alternatively, a feature is functional "if

exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Prod. Co., 514 U.S. 159, 165 (1995); see also Millennium Labs., 817 F.3d at 1127–28 (clarifying that the two inquiries are alternative methods of assessing functionality).

In the Ninth Circuit, "the test for functionality proceeds in two steps. For the first step, courts inquire whether the alleged significant non-trademark function satisfies the Inwood Laboratories definition of functionality—'essential to the use or purpose of the article or affects its cost or quality.' . . . If the claimed trade dress is determined to be functional under Step One, then the inquiry is over. If not, the court must proceed to the second step and address aesthetic functionality by inquiring whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." Millennium Labs., 817 F.3d at 1128–29 (internal quotations marks and citations omitted).

"Functionality is generally viewed as an intensely factual issue." Id. at 1129 (quoting Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002)). Moreover, multiple functional items may be combined into a non-functional aesthetic whole. Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987) ("functional elements that are separately unprotectable can be protected together as part of a trade dress. In other words, our inquiry is not addressed to whether individual elements of the trade dress fall within the definition of functional, but to whether the whole collection of elements taken together are functional.") (citation omitted). As a result, "[g]enericness and functionality are questions of fact, making dismissal under Rule 12(b)(6) inappropriate." Autodesk, 2008 WL 6742224, at *2; see also Axis Imex, Inc. v. Sunset Bay Rattan, Inc., Case No. 08-cv-3931-RS, 2009 WL 55178, at *3 (N.D. Cal. Jan. 7, 2009) (complaint that alleges some functional and some non-functional design elements survived motion to dismiss); but see Virgin Scent, Inc. v. Bel Air Natruals Care Corp., No. CV1708284ABRAOX, 2018 WL 5264145, at *5 (C.D. Cal. Feb. 8, 2018) ("case law does not relieve Plaintiff of its obligation to adequately *plead* non-functionality

in order to state a claim for trade dress infringement"); <u>Deckers Outdoor Corp. v. Fortune Dynamic, Inc.</u>, No. CV 15-769 PSG (SSX), 2015 WL 12731929, at *4 (C.D. Cal. May 8, 2015) (plaintiff must "allege *how* a trade dress is non-functional" and cannot rely on description of "an overall [non-functional] aesthetic look").

Here, plaintiffs allege certain elements that appear to be functional (like divots in the plastic and separate containers to segregate different ingredients) in addition to apparently non-functional design elements (like the arrangement of the divots in the plastic, the arrangement of the segregated containers in a circular pattern, and the font and other design elements of the label). Plaintiffs' allegations present factual questions that cannot be resolved on this motion to dismiss with respect to whether what they seek to protect is functional.

For the foregoing reasons, defendant's motion to dismiss plaintiffs' fifth cause of action for trade dress infringement as alleged against Fresh Express is DENIED.

### 5. Seventh and Eighth Claims: Unfair Competition

The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Bus. & Prof. Code. § 17200. "Each prong of the UCL is a separate and distinct theory of liability[.]" <u>Lozano v. AT & T Wireless Servs., Inc.</u>, 504 F.3d 718, 731 (9th Cir. 2007); <u>see also</u> <u>Imax Corp. v. Cinema Techs., Inc.</u>, 152 F.3d 1161, 1169 (9th Cir. 1998) (discussing common law unfair competition).

Defendant argues that to the extent plaintiffs' common-law and statutory unfair competition claims are based on trade dress infringement, they fail along with that claim. As discussed above, plaintiffs' trade dress infringement claim is adequately pled. Accordingly, defendant's motion to dismiss plaintiffs' unfair competition claims is DENIED.

### 6. Ninth Claim: Breach of Contract

Fresh Express argues that it cannot be held liable for breaching any contracts to which it is not a party. Plaintiffs argue that, notwithstanding the language of the contracts, the codefendants who signed the NDAs at issue in their personal capacity

were additionally signing on behalf of Fresh Express.

The complaint alleges that "Olivo, Dively, and Pereira breached their NDA's as part of their job duties for Fresh Express and for the benefit of Fresh Express." FAC ¶ 81. "Therefore, Fresh Express should be deemed to be a signatory to the NDA's of Olivo, Dively, and Pereira." FAC ¶ 82.

The parties agree that Fresh Express did not execute an NDA with Five Star, and that each of its employees who entered into an NDA did so expressly in their individual capacities. See FAC, Exs. 8–10. Paragraph 7 of each of each of the NDAs states, "This Agreement is personal to you, [and] is nonassignable by you." Id.

"The general rule in California is that 'only a signatory to a contract may be liable for any breach.'" St. Vincent Med. Ctr. v. Mega Life & Health Ins. Co., 585 F. App'x 417 (9th Cir. 2014) (quoting Clemens v. Am. Warranty Corp., 193 Cal. App. 3d 444, 452 (1987) ("Under California law, only a signatory to a contract may be liable for any breach.")); see also Tri-Continent Internat. Corp. v. Paris Sav. & Loan Assn., 12 Cal. App. 4th 1354, 1359 (1993) ("[Plaintiff] cannot assert a claim for breach of contract against one who is not a party to the contract.").

Plaintiffs cite to a single case to support their argument that a non-signatory can be liable for breach of a contract in these circumstances, Imax Corp., 152 F.3d at 1161. That case, however, did not address an analogous breach of contract claim. Instead, that case held that the plaintiff's allegation that a third party breached a confidential relationship (like the NDA here) was sufficient to allege an unfair competition claim against the defendant who knowingly accepted such information. Applying the holding in Imax here would at best allow plaintiffs to state an unfair competition claim against Fresh Express for knowingly accepting the information Olivo, Dively, and Pereira learned under NDA. But such allegations do not support a breach of contract claim against Fresh Express, which was not a signatory to the allegedly-breached contract.

Plaintiffs appear to argue that Fresh Express signed the agreement under an unspecified agency theory. They argue that "[i]t was Fresh Express, acting through its

1    agents, that signed the non-disclosure agreement and toured the facility."  Opp. at 15.

2    The FAC alleges that "Olivo, Dively, and Pereira entered into those NDA's as part of their

3    job duties for Fresh Express."  FAC ¶ 80.

4         The fatal flaw in plaintiffs' argument is that the contract itself clearly provides that

5    "This Agreement is personal to you, [and] is nonassignable by you[.]"  FAC, Exs. 8–10

6    ¶ 7.  The "you" referenced in the agreement is the individually-identified signatory, and

7    the signature pages of the NDAs identify the individuals qua individuals.  The contract

8    makes no reference to Fresh Express, signing on behalf of Fresh Express, or otherwise

9    acting on behalf of Fresh Express.  Because the NDAs are explicit in this regard,

10   amendment would be futile, and plaintiffs' breach of contract cause of action is

11   DISMISSED WITH PREJUDICE as to Fresh Express.

12        **7.    Tenth Claim:  Intentional Interference With Contract**

13        Fresh Express argues that plaintiffs' claim for misappropriation of trade secrets

14   displaces their claim for interference with contract.[6]  Plaintiffs argue that the claim is not

15   displaced because the interference claim has different elements.  Moreover, plaintiffs

16   argue that pleading in the alternative is permissible at this stage, so that even if the claim

17   were displaced by the CUTSA, they should be permitted to pursue an interference claim

18   in the event their CUTSA claim fails.

19        The California Uniform Trade Secrets Act was intended "to occupy the field of

20   trade secret liability to the exclusion of other civil remedies."  Silvaco Data Sys. v. Intel

21   Corp., 184 Cal. App. 4th 210, 234 (2010).  CUTSA therefore "preempts common law

22   claims that are 'based on the same nucleus of facts as the misappropriation of trade

23   secrets claim for relief.'"  K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.,

24

25   [6] Courts and litigants "sometimes use the word 'preempt' rather than 'displace' in
     discussing what effect the California Code has on the other causes of action.
26   Technically, the doctrine of preemption concerns whether a federal law has superseded a
     state law or a state law has superseded a local law, not whether one provision of state
27   law has displaced other provisions of state law.  Here, the California Code and other
     causes of action are all matters of state law.  Accordingly, we will use the word 'displace'
28   in discussing this issue." Zengen, Inc. v. Comerica Bank, 41 Cal. 4th 239, 247 n.5 (2007)
     (citations omitted).

171 Cal. App. 4th 939, 958 (2009) (quoting <u>Digital Envoy, Inc. v. Google, Inc.</u>, 370 F.

Supp. 2d 1025, 1035 (N.D. Cal. 2005)).  "Common law claims premised on the wrongful

taking of information which does not qualify as a trade secret are also superseded,

unless the plaintiff identifies some law which confers the plaintiff with property rights in

the information."  <u>Bus. Sols., LLC v. Ganatra</u>, No. SACV181426DOCKESX, 2019 WL

926351, at *6 (C.D. Cal. Jan. 7, 2019) (citing <u>Silvaco</u>, 184 Cal. App. 4th at 236–40); <u>see</u>

<u>also</u> <u>Angelica Textile Servs., Inc. v. Park</u>, 220 Cal. App. 4th 495, 506 (2013) ("In general,

the acquisition, disclosure or transfer of information that does not fit UTSA's definition of

a trade secret does not give rise to any liability, even when that liability is couched in

terms of a separate tort or statutory violation."); <u>Jardin v. Datallegro, Inc.</u>, 10-cv-2552–

IEG-WVG, 2011 WL 1375311, at *4 (S.D. Cal. Apr. 12, 2011) ("CUTSA preempts all

claims based upon the misappropriation of confidential information, whether or not that

information rises to the level of a trade secret.") (internal quotation marks omitted);

<u>Mattel, Inc. v. MGA Entm't, Inc.</u>, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011) ("[C]UTSA

supersedes claims based on the misappropriation of confidential information, whether or

not that information meets the statutory definition of a trade secret."); <u>see generally</u>

<u>Silvaco</u>, 184 Cal. App. 4th at 239 n.22 ("a prime purpose of the law was to sweep away

the adopting states' bewildering web of rules and rationales and replace it with a uniform

set of principles for determining when one is—and is not—liable for acquiring, disclosing,

or using 'information . . . of value.'").  However, CUTSA does not displace "(1) contractual

remedies, whether or not based upon misappropriation of a trade secret, (2) other civil

remedies that are not based upon misappropriation of a trade secret, or (3) criminal

remedies[.]"  Cal. Civ. Code § 3426.7(b).

Thus, for non-contractual civil remedies, the issue is whether "the gravamen of the

wrongful conduct asserted . . . is the misappropriation of trade secrets."  <u>K.C. Multimedia</u>,

171 Cal. App. 4th at 961; <u>accord</u> <u>Banawis-Olila v. World Courier Ground, Inc.</u>, Case No.

16-cv-00982-PJH, 2016 WL 6563354, at *3 (N.D. Cal. Nov. 4, 2016); <u>see also</u> <u>Angelica</u>

<u>Textile Servs.</u>, 220 Cal. App. 4th at 506 ("[C]UTSA does not displace noncontract claims

United States District Court
Northern District of California

1    that, although related to a trade secret misappropriation, are independent and based on

2    facts distinct from the facts that support the misappropriation claim.").  That

3    "determination of whether a claim is based on trade secret misappropriation is largely

4    factual."  K.C. Multimedia, 171 Cal. App. 4th at 954.

5          For example, a claim alleging a violation of a duty of loyalty is not displaced by

6    CUTSA where the duty of loyalty would be violated by undertaking competitive acts,

7    regardless of whether any proprietary information was implicated.  See Angelica Textile

8    Servs., 220 Cal. App. 4th at 499.  However, "where the allegation is that [a defendant]

9    breached his duty of loyalty by disclosing trade secrets[,] [t]he claim for breach of

10   fiduciary duty is based on the same operative facts and is therefore preempted by

11   CUTSA." Anokiwave, Inc. v. Rebeiz, No. 18-cv-629 JLS (MDD), 2018 WL 4407591, at *4

12   (S.D. Cal. Sept. 17, 2018); see also Digital Envoy, 370 F. Supp. 2d at 1035 (CUTSA

13   displaced "claims for unfair competition and unjust enrichment since those claims are

14   based on the same nucleus of facts as the misappropriation of trade secrets claim for

15   relief"); Bus. Sols., 2019 WL 926351, at *8 (claims "for inducement of breach of contract

16   and interference with contractual relations arise under the same nucleus of facts as the

17   third cause of action for misappropriation of trade secrets" where allegation was that

18   employee "was solicited 'to breach his contract by misappropriating [his employer's]

19   Trade Secrets'"); Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc., 318 F.

20   Supp. 2d 216, 220 (D. Del. 2004) (claims for conversion and unjust enrichment were

21   displaced where they were "based entirely on the same factual allegations that form the

22   basis of its trade secrets claim").

23         Here, Five Star alleges that Fresh Express and its employees convinced Five Star

24   to allow Fresh Express employees to tour its production facilities and otherwise learn

25   sensitive information, subject to NDAs.  FAC ¶¶ 17–18.  The information the employees

26   learned was valuable.  FAC ¶ 19.  Then, "Fresh Express intentionally took steps to

27   convince Proseal, Olivo, Dively, and Pereira to breach their NDA's with Five Star."  FAC

28   ¶ 87.  Fresh Express subsequently used the information it learned as a result of inducing

those breaches to compete against Five Star. FAC ¶¶ 20–22. These allegations underlying plaintiffs' intentional interference claim are clearly based on the same nucleus of facts underlying their misappropriation claim. That is because the breaches of the NDAs were one of the mechanisms by which Fresh Express allegedly "misappropriated" the confidential information (including the trade secrets) at issue.

Plaintiffs argue that they are attempting to enforce an independent property right, "which is the sanctity and enforceability of their nondisclosure agreements." Opp. at 17. They argue that dismissal of their intentional interference claim "would render the non-disclosure agreements it requires of outsiders meaningless." Id. at 18. Not so. In fact, CUTSA expressly exempts actions for breach of contract from the scope of its displacement effect, and plaintiffs assert such causes of action against codefendants for breaching their nondisclosure agreements.

Plaintiffs argue that they can avoid CUTSA displacement by basing their interference claim on facts underlying their trade dress infringement and UCL claims, as well as violations of the nondisclosure agreement based on disclosure of confidential (but not trade secret) information. The court is skeptical. To the extent plaintiffs would base their interference claim on NDA signatories' disclosure of confidential information that does not qualify as a trade secret, such an amendment to the complaint would be futile. E.g., Angelica Textile Servs., 220 Cal. App. 4th at 506 ("In general, the acquisition, disclosure or transfer of information that does not fit UTSA's definition of a trade secret does not give rise to any liability, even when that liability is couched in terms of a separate tort or statutory violation."). To the extent plaintiffs would base their interference claim on facts underlying their trade dress infringement or UCL claims, plaintiffs must identify the allegedly-offending conduct with sufficient particularity to put defendant on notice of the scope of the claim. Given the pleadings before the court, it is unclear what facts could support plaintiffs' claim of intentional inference that would not, at their core, concern the NDA signatories' improper sharing of information with Fresh Express and thus be displaced by CUTSA. Because the court is not convinced that amendment of this

1    claim would necessarily be futile, plaintiffs shall have leave to amend their complaint to

2    state an intentional interference cause of action against Fresh Express.

3         Plaintiffs also argue that they should be permitted to plead this cause of action in

4    the alternative, because it is possible that the finder of fact will find that the subject matter

5    at issue is not a trade secret.  Although alternative pleading is generally permitted,

6    "CUTSA preemption extends to claims based on the misappropriation of confidential and

7    proprietary information, regardless of whether it qualifies as a 'trade secret.'"  Avago

8    Techs. U.S. Inc. v. Nanoprecision Prod., Inc., Case No. 16-cv-03737-JCS, 2017 WL

9    412524, at *6 (N.D. Cal. Jan. 31, 2017) (collecting cases).  "[A] prime purpose of the law

10   was to sweep away the adopting states' bewildering web of rules and rationales and

11   replace it with a uniform set of principles for determining when one is—and is not—liable

12   for acquiring, disclosing, or using 'information ... of value.'  Central to the effort was the

13   act's definition of a trade secret.  Information that does not fit this definition, and is not

14   otherwise made property by some provision of positive law, belongs to no one, and

15   cannot be converted or stolen."  Silvaco, 184 Cal. App. 4th at 239 n.22 (citations omitted).

16   Because CUTSA displaces claims alleging misappropriation of even confidential

17   information that does not qualify for trade-secret protection, plaintiffs' argument

18   concerning alternative pleading fails.

19                                **CONCLUSION**

20        For the foregoing reasons, defendant's motion to dismiss plaintiffs' first cause of

21   action for fraud as alleged against Fresh Express is GRANTED, and the claim is

22   DISMISSED WITH LEAVE TO AMEND; defendant's motion to dismiss plaintiffs' second

23   cause of action for misappropriation of trade secrets as alleged against Fresh Express is

24   DENIED; defendant's motion to dismiss plaintiffs' third cause of action for design patent

25   infringement as alleged against Fresh Express is DENIED; defendant's motion to dismiss

26   plaintiffs' fifth cause of action for trade dress infringement as alleged against Fresh

27   Express is DENIED; defendant's motion to dismiss plaintiffs' seventh and eighth causes

28   of action for unfair competition as alleged against Fresh Express is DENIED; defendant's

motion to dismiss plaintiffs' ninth cause of action for breach of contract as alleged against Fresh Express is GRANTED, and the claim is DISMISSED WITH PREJUDICE; and defendant's motion to dismiss plaintiffs' tenth cause of action for intentional interference with contract as alleged against Fresh Express is GRANTED, and the claim is DISMISSED WITH LEAVE TO AMEND.  Plaintiffs shall file any amended complaint within 21 days of the date of this order.  No new parties or causes of action may be pleaded without leave of court or the agreement of all defendants.

**IT IS SO ORDERED.**

Dated:  January 31, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge