UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIVE STAR GOURMET FOODS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FRESH EXPRESS, INC., et al.,<br><br>Defendants. | Case No. 19-cv-05611-PJH<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 38 |

Defendant Proseal America, Inc.'s ("Proseal") motion to dismiss came on for hearing before this court on February 19, 2020. Plaintiffs Five Star Gourmet Foods, Inc. ("Five Star") and Direct Pack, Inc. ("Direct Pack") appeared through their counsel, Chris Arledge. Defendant appeared through its counsel, Jeanne Gills. Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby GRANTS defendant's motion for the following reasons.

## BACKGROUND

On September 5, 2019, plaintiffs Five Star and Direct Pack filed the original complaint in this action against defendants Fresh Express, Inc. ("Fresh Express"), Proseal, Plastic Ingenuity, Inc. ("Plastic Ingenuity"), John Olivo, Kenneth Dively, Fabian Pereira, and Doe defendants. On October 31, 2019, plaintiffs filed a First Amended Complaint ("FAC"). Dkt. 13. The FAC asserts ten causes of action: (1) fraud and deceit; (2) misappropriation of trade secrets; (3) design patent infringement; (4) active inducement of patent infringement; (5) trade dress infringement; (6) active inducement of

trade dress infringement; (7) common law unfair competition; (8) statutory unfair competition; (9) breach of contract; and (10) intentional interference with contract. Plaintiffs asset the Second, Fourth, and Sixth through Ninth causes of action against Proseal.

On December 30, 2019, defendant Proseal filed the present motion to dismiss based on Federal Rules of Civil Procedure 12(b)(6). The motion seeks to dismiss all claims asserted against Proseal. Proseal also filed a request for judicial notice ("RJN") consisting of seven images of Proseal's machinery. Dkt. 39. Plaintiffs object to the RJN. Dkt. 47. Prior to the hearing on this motion, the court issued an order granting in part and denying in part defendant Fresh Express' motion to dismiss. Dkt. 59. In response to that order, plaintiffs filed a Second Amended Complaint (Dkt. 67, the "SAC"), and the parties have stipulated that the pending motion to dismiss should apply to the SAC. Dkt. 71. For purposes of this motion, the SAC is substantially similar to the FAC and alleges the same causes of action.

Plaintiff Five Star is a California corporation that sells pre-packaged salads in plastic containers. Those plastic containers are configured with various compartments such that the salad's ingredients are kept separate in the packaging. SAC ¶¶ 17, 23. Plaintiff Direct Pack is a co-owner, with Five Star, of U.S. Design Patent Nos. 698,665 and 698,666. Id. ¶ 40. Defendant Fresh Express also sells pre-packaged snacks and salads and also uses plastic packaging that divides salad ingredients into segregated compartments while packaged. Plaintiffs allege that Fresh Express infringed on their design patents and trade dress. Id. ¶¶ 39–44, 51–61. Defendant Proseal is a Virginia corporation and supplies machinery to both Five Star and Fresh Express necessary to seal each company's salad bowl products. Id. ¶¶ 4, 24.

Plaintiffs' claims against Proseal derive largely from allegations concerning Five Star and Fresh Express. The court's January 31, 2020 order contains a more thorough recitation of the facts between those parties. Dkt. 59. In 2016, a Fresh Express executive met a Five Star executive at a trade show and, through later communications,

Fresh Express stated an interest in exploring how the two companies could "develop a fruitful partnership together." SAC ¶ 16. Five Star agreed to permit Fresh Express executives to tour Five Star's Florida facility in May 2017. Id. ¶ 18. All of the visitors signed non-disclosure agreements before entering the facility, as is required of all visitors to Five Star. Five Star showed them its production process, how it staffs its production lines, the equipment and equipment vendors it uses, and provided a comprehensive view of Five Star's entire salad bowl production process, including how it set up its assembly lines and the order of operations. Id.

Plaintiffs allege that Fresh Express has since used Five Star's confidential business information and publicly available information to copy every aspect of Five Star's patented salad bowl product. As noted above, defendant Proseal has long been Five Star's supplier for the packaging machinery that seals its salad-bowl products. Id. ¶ 24. Proseal is subject to a non-disclosure agreement as part of its relationship with Five Star. As part of its alleged efforts to misappropriate Five Star's products and packaging, "Fresh Express convinced Proseal to sell to Fresh Express similar packaging machinery as well as create a manufacturing tool set that is virtually indistinguishable from the tool set used for Five Star's packaging equipment." Id. Plaintiffs allege this allows Fresh Express to make packaging that is indistinguishable from Five Star's and without the cost associated with developing new packaging.

**DISCUSSION**

**A.  Legal Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Somers v. Apple, Inc., 729 F.3d 953, 959 (9th

Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 558–59 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

**B. Analysis**

    **1. Evidentiary Issues**

The court begins with two evidentiary matters. First, plaintiffs submitted a declaration from Five Star's CEO, attached to their opposition brief, concerning certain factual matters. Dkt. 46-1, (the "Shoshan Decl."). Defendant objects to the contents of the declaration. Reply at 2. Second, defendant filed an RJN seeking to notice images of its machinery. Dkt. 39. Plaintiffs objected to the RJN. Dkt. 47.

        **a. Shoshan Declaration**

The Shoshan Declaration describes the purported trade secrets that Five Star provided to Proseal including "packaging prototypes, technical drawings, and information regarding the precise mixture of tightness, seal quality, vacuum level, gas flush levels, and oxygen levels . . ." Shoshan Decl. ¶ 4. The declaration also describes the process by which Proseal developed a bespoke toolset for Five Star and how Five Star tested samples of Fresh Express' salad bowl using the Proseal sealing machinery developed

4

exclusively for Five Star. Id. ¶¶ 5–7. Finally, Five Star's CEO describes how he informed Proseal's CEO that competitors were trying to mimic Five Star's packaging. Proseal's CEO assured him that he would not assist Five Star's competitors. Proseal's CEO allegedly later admitted to Five Star's CEO that Fresh Express' infringing packaging appeared to be the same as Five Star's. Id. ¶¶ 9–10.

"Courts regularly decline to consider declarations and exhibits submitted in support of or opposition to a motion to dismiss . . . if they constitute evidence not referenced in the complaint or not a proper subject of judicial notice." Gerritsen v. Warner Bros. Entm't Inc., 112 F. Supp. 3d 1011, 1021 (C.D. Cal. 2015) (citing City of Royal Oak Retirement Sys. v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1060 (N.D. Cal. 2012)); see also Schneider v. Cal. Dep't of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."). "The court must, however, consider each exhibit to the declaration in turn to determine whether it is a proper subject of judicial notice or can be taken into account under the incorporation by reference doctrine in deciding [defendant's] motion to dismiss." Gerritsen, 112 F. Supp. 3d at 1021–22.

With regard to judicial notice, Federal Rule of Evidence 201 permits a court to notice a fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). Defendant contends that the facts recited in the declaration are neither publicly available nor verifiable. Reply at 2. The court agrees; the declaration consists of statements by Mr. Shoshan and are not publicly available or verifiable. Therefore, the declaration is not judicially noticeable.

The incorporation by reference doctrine is judicially created and is normally applicable when a defendant seeks to incorporate a document into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the

1 plaintiff's claim." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir.
2 2018), cert. denied sub nom. Hagan v. Khoja, 139 S. Ct. 2615 (2019) (quoting United
3 States v. Ritchie, 342 F.3d 903, 907 (9th Cir. 2003)). "We have extended the doctrine of
4 incorporation by reference to consider documents in situations where the complaint
5 necessarily relies upon a document or the contents of the document are alleged in a
6 complaint, the document's authenticity is not in question and there are no disputed issues
7 as to the document's relevance." Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038
8 (9th Cir. 2010).

The present situation does not fall within the incorporation by reference doctrine because plaintiffs (rather than defendant) seek to incorporate a new document outside of their own initial pleadings. Even if the court were to allow plaintiffs to apply the doctrine, the Shoshan Declaration is not referenced in the FAC, attached as an exhibit, or referenced by defendant. Further, defendant disputes its contents. Thus, the incorporation by reference doctrine is not appropriate here.

Neither judicial notice nor incorporation by reference applies and the Shoshan Declaration is not appropriate to consider at the pleading stage. Moreover, plaintiffs' counsel agreed with this conclusion at the hearing and indicated the Declaration was intended to demonstrate additional allegations that could be pled should the court dismiss the complaint. Dkt. 69 at 22. Accordingly, the court will not consider the Shoshan Declaration for purposes of defendant's motion.

### b. Defendant's Request for Judicial Notice

Defendant Proseal requests this court take judicial notice of images of its machinery, taken from a YouTube video of Proseal's machinery. RJN at 3 n.1. Defendant argues that the court should take judicial notice of its pictures because courts take judicial notice of both websites (because they are publicly verifiable) and images of accused products when design patent infringement is alleged. Id. at 2. Defendant argues that the court should extend this reasoning to claims of inducement of design patent infringement. Id. at 2–3. Plaintiffs respond that they dispute the authenticity of the

6

photographs and a lay person cannot draw factual conclusions by looking at photographs. Therefore, it is inappropriate to take judicial notice of such disputed photographs. Dkt. 47, at 2.

Generally, when considering whether to grant a request for judicial notice, a court may consider factual information from the internet as long as the facts are not subject to reasonable dispute. See, e.g., Perkins v. LinkedIn Corp., 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014). In Perkins, the court granted requests for judicial notice related to text that was displayed online because the accuracy of the text was not in dispute. Here, defendant intends to submit pictures, which have several possible interpretations and, unlike text, can be subject to reasonable dispute. Plaintiffs have raised such objections here and courts "cannot take judicial notice of the contents of documents for the truth of the matters asserted therein when the facts are disputed." Cal. Sportfishing Prot. All. v. Shiloh Grp., LLC, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017).

When considering whether a product infringes on a design patent, a court may consider, as defendant contends, a picture of an accused product. See, e.g., Anderson v. Kimberly-Clark Corp., 570 Fed. App'x 927, 932 (Fed. Cir. 2014). Yet, as the Federal Circuit has noted, the purpose of noticing a picture in this context is to "compare the drawings of the patented design to the appearance of the accused products." Id. Yet, defendant is not requesting the court notice the infringing product to compare against plaintiffs' patented design. It requests the court notice a machine that creates a seal on the infringing product. This request stretches the bounds of judicial notice too far. The inducement claim does not require the court to compare a picture of defendant's product, which is not the infringing product, to plaintiffs' design patent.

Accordingly, the court DENIES defendant's RJN.

**2. Second Claim: Misappropriation of Trade Secrets**

Plaintiffs' second claim (and first against Proseal) is for misappropriation of trade secrets. "To state a claim for trade secret misappropriation under the DTSA [Defend Trade Secrets Act] and the CUTSA [California Uniform Trade Secrets Act], a plaintiff

7

must allege that: '(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff.'" Alta Devices, Inc. v. LG Elecs., Inc., 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (citations omitted).

The DTSA defines "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The California UTSA defines a " '[t]rade secret' " as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "'Information' has a broad meaning under the [UTSA]." Altavion, Inc. v. Konica Minolta Sys. Lab., Inc., 226 Cal. App. 4th 26, 53 (Ct. App. 2014).

> The definition of trade secret is . . . unlimited as to any particular class or kind of matter and may be contrasted with matter eligible for patent or copyright protection, which must fall into statutorily defined categories. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device or list of customers.

Id. (citations omitted).

"[C]ourts are 'in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a

8

1    requirement would result in public disclosure of the purported trade secrets." Autodesk,
2    Inc. v. ZWCAD Software Co., No. 5:14-CV-01409-EJD, 2015 WL 2265479, at *6 (N.D.
3    Cal. May 13, 2015).  Accordingly, a "plaintiff need not spell out the details of the trade
4    secret," but it must "describe the subject matter of the trade secret with sufficient
5    particularity to separate it from matters of general knowledge in the trade or of special
6    persons who are skilled in the trade, and to permit the defendant to ascertain at least the
7    boundaries within which the secret lies." Alta Devices, 343 F. Supp. 3d at 881 (citations,
8    internal quotation marks and alterations omitted); see also Vendavo, Inc. v. Price f(x) AG,
9    No. 17-cv-06930-RS, 2018 WL 1456697, at *3–4 (N.D. Cal. Mar. 23, 2018) (rejecting the
10   following allegations as insufficiently-specific:  "source code, customer lists and customer
11   related information, pricing information, vendor lists and related information, marketing
12   plans and strategic business development initiatives, 'negative knowhow' learned through
13   the course of research and development, and other information related to the
14   development of its price-optimization software, including ideas and plans for product
15   enhancements).

16   Here, plaintiffs argue that Five Star possessed confidential information that it
17   conveyed to defendant as part of the collaborative process of building a tool for Five
18   Star's use.  Opp. at 8.  Notably, the trade secrets plaintiffs reference in their opposition
19   brief are not contained in the SAC or any exhibits incorporated by reference in the SAC—
20   they are described in the Shoshan Declaration, which the court cannot consider for this
21   motion.  The remaining allegations in the SAC do not in any way provide defendant
22   notice as to the trade secret at issue.  For example, the SAC alleges that Fresh Express
23   "convinced Proseal to closely duplicate the tool set used to manufacture Five Star's
24   distinctive packaging, and with insignificant changes, provide a virtually indistinguishable
25   tool set to Fresh Express."  SAC ¶ 37.  Plaintiffs do not allege a trade secret.

26   Because plaintiffs do not allege a trade secret, the court need not evaluate the
27   remaining element of a misappropriation claim.  For the foregoing reasons, defendant's
28   motion to dismiss plaintiffs' second cause of action for misappropriation of trade secrets

as alleged against Proseal is GRANTED.

### 3. Fourth Claim: Active Inducement of Design Patent Infringement

Plaintiffs' fourth claim is for active inducement of design patent infringement. Title 35 U.S.C. § 271(b) governs induced patient infringement and provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." "To prove inducement of infringement, the patentee must []show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc. (Power Integrations II), 843 F.3d 1315, 1332 (Fed. Cir. 2016) (alteration in original) (quoting Astornet Techs. Inc. v. BAE Sys., Inc., 802 F.3d 1271, 1279 (Fed. Cir. 2015)). This means that plaintiffs must demonstrate that: "(1) a third party directly infringed the asserted claims of the . . . patents; (2) [defendant] induced those infringing acts; and (3) [defendant] knew the acts it induced constituted infringement." Power Integrations II, 843 F.3d at 1332. "To satisfy the knowledge requirement, either actual knowledge or willful blindness is required." Asia Vital Components Co. v. Asetek Danmark A/S, 377 F. Supp. 3d 990, 1016 (N.D. Cal. 2019) (citing Glob.-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 766 (2011)). "Willful blindness is a high standard, requiring that the alleged inducer (1) subjectively believe that there is a high probability that a fact exists and (2) take deliberate actions to avoid learning of that fact." Info-Hold, Inc. v. Muzak LLC, 783 F.3d 1365, 1373 (Fed. Cir. 2015) (citing Glob.-Tech Appliances, 563 U.S. at 769).

With regard to the first element, the parties do not address whether Fresh Express' product infringes on Five Star's design patents. Because defendant does not contest infringement and given this court's order denying defendant Fresh Express' motion to dismiss the underlying design patent claim (Dkt. 59, at 17), the court assumes (but does not decide), that Fresh Express' product infringes on Five Star's design patent.

#### a. Whether Defendant Induced an Infringing Act

The second element requires the court to determine whether the accused inducer took an affirmative act to encourage infringement. Power Integrations II, 843 F.3d at

10

1332.  Proseal advances two theories to rebut this element: first, the SAC's allegations demonstrate legal business activity.  Second, defendant did not alter its business arrangements with either Fresh Express or Five Star, which it characterizes as inaction rather than an affirmative act.  Therefore, it cannot be held liable under an inducement of patent infringement theory for failing to prevent a third-party from infringing.  Mtn. at 14.  Plaintiffs argue that the affirmative act was to supply the tool necessary for Fresh Express to infringe on Five Star's product.  Opp. at 10.

In Asia Vital Components, the court found that the defendant "took the affirmative step of 'manufacturing and selling/shipping the 1.5, 2.0, K7127N and K9 products to the United States,' thereby supporting induced infringement as to claims 14 and 15 of the [patent at issue]."  377 F. Supp. 3d at 1017 (citation omitted).  Here, defendant has taken a similar affirmative step because it manufactured and shipped a product that supported Fresh Express' alleged infringement of plaintiffs' design patents.  That is sufficient to demonstrate an affirmative act.

The cases cited by defendant do not require a different result.  Generally, "[s]ection 271(b) does not encompass inaction or failure to stop another's continued direct infringement."  Grecia v. VUDU, Inc., No. C-14-0775-EMC, 2015 WL 538486, at *9 (N.D. Cal. Feb. 9, 2015).  Yet, defendant's business practice do not meet the general principle outlined in Grecia.  As alleged, defendant's business practice was to provide machines to Fresh Express; those machines then helped create Fresh Express' products that allegedly infringe on plaintiffs' design patents.  The provision of machines is an affirmative step.

Defendant also cites Tierra Borinquen, Inc. v. ASUS Computer International, Inc., No. 13-CV-38-JRG, 2014 WL 894805, at *6 (E.D. Tex. Mar. 4, 2014), as an example where a court found that a "neutral reseller" of products did not take any affirmative steps to induce infringement.  In Tierra, the defendant, OfficeMax, purchased infringing office products in bulk and resold them at retail to customers.  Id.  There was no special relationship between OfficeMax and the producer of the infringing product.  The court

11

1 concluded that "the failure to change behavior in light of a new fact cannot be
2 characterized as an affirmative step evincing desire on the part of OfficeMax that users
3 infringe [the plaintiff's] patents." Id. Tierra is not an analogous situation. Unlike
4 OfficeMax, Proseal provides bespoke products based on specifications arrived upon in
5 collaboration with customers, such as Five Star and Fresh Express. It is not a neutral
6 reseller and has a closer relationship to its customers than a neutral reseller. Thus,
7 plaintiffs have alleged sufficient facts that an affirmative act occurred.

### b. Whether Defendant Knew the Induced Acts Constituted Infringement

Plaintiffs argue that defendant's knowledge of the infringing acts is based on specific discussions between executives at Proseal and Five Star. This discussion is proffered exclusively in the Shoshan Declaration, which the court does not consider. Plaintiffs' remaining allegations concerning defendant's knowledge are entirely conclusory. For example, plaintiffs allege "Fresh Express convinced Proseal to sell them similar equipment" and "Proseal provided the machinery and tool sets with the express intention of aiding Fresh Express in its patent infringement." SAC ¶¶ 24, 47. These allegations do not address factual circumstances concerning knowledge of inducement.

In sum, defendant may have committed affirmative acts by supplying machinery and tool sets to Fresh Express, but, without factual allegations of knowledge (or willful blindness), plaintiffs have simply demonstrated that defendant was carrying on normal business activities. For the foregoing reasons, defendant's motion to dismiss plaintiffs' fourth cause of action for active inducement of design patent infringement as alleged against Proseal is GRANTED.

### 4. Sixth Claim: Active Inducement of Trade Dress Infringement

Plaintiffs' sixth claim is for active inducement of trade dress infringement. "To be liable for contributory [i.e., inducement] trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the

particular product supplied." Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 807 (9th Cir. 2007) (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 (1982)). "All theories of secondary liability for copyright and trademark infringement require some underlying direct infringement by a third party." Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc., 591 F. Supp. 2d 1098, 1104 (N.D. Cal. 2008) (citing Perfect 10, 494 F.3d at 795, 807). The court first addresses the underlying trade dress infringement claim and then the inducement elements.

### a. Trade Dress Infringement

The underlying trade dress infringement claim requires plaintiffs to demonstrate: "(1) that [their] claimed dress is nonfunctional; (2) that [their] claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1258 (9th Cir. 2001) (citing Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1005 (9th Cir. 1998); and Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 841 (9th Cir. 1987)).

#### i. First Element: Functionality

The parties dispute whether Five Star's purported trade dress claim is functional. "A product feature is functional and cannot serve as a trademark if the product feature is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 165 (1995). In the Ninth Circuit,

> the test for functionality proceeds in two steps. For the first step, courts inquire whether the alleged significant non-trademark function satisfies the Inwood Laboratories definition of functionality—'essential to the use or purpose of the article or affects its cost or quality.' . . . If the claimed trade dress is determined to be functional under Step One, then the inquiry is over. If not, the court must proceed to the second step and address aesthetic functionality by inquiring whether protection of the feature as a trademark would impose a significant non-

13

reputation-related competitive disadvantage.

Millennium Labs., Inc. v. Ameritox, Ltd., 817 F.3d 1123, 1128–29 (9th Cir. 2016) (internal quotation marks and citations omitted).

"Functionality is generally viewed as an intensely factual issue." Id. at 1129 (quoting Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 783 (9th Cir. 2002)). Moreover, multiple functional items may be combined into a non-functional aesthetic whole. Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987) ("[F]unctional elements that are separately unprotectable can be protected together as part of a trade dress. In other words, our inquiry is not addressed to whether individual elements of the trade dress fall within the definition of functional, but to whether the whole collection of elements taken together are functional."). "Genericness and functionality are questions of fact, making dismissal under Rule 12(b)(6) inappropriate." Autodesk, Inc. v. Dassault Systemes SolidWorks Corp., No. C08-04397 WHA, 2008 WL 6742224, at *2 (N.D. Cal. Dec. 18, 2008). Plaintiffs have the burden to establish that their trade dress is nonfunctional. See Arcsoft, Inc. v. Cyberlink Corp., 153 F. Supp. 3d 1057, 1068 (N.D. Cal. 2015).

Defendant argues that plaintiffs' trade dress claim fails as a matter of law for two reasons. Mtn. at 18. First, the claim does not adequately define the elements of the purported trade dress. Second, the trade dress protection does not extend to functional elements of the item. In response to both arguments, plaintiffs respond that functionality is a highly factual question that is not appropriately decided at the pleadings stage. Opp. at 11.

In support of its first argument, defendant cites a series of cases that stand for the proposition that the plaintiffs' description of its trade dress must give defendant sufficient notice as to the trade dress claim. See, e.g., Sleep Sci. Partners v. Lieberman, No. 09-04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010) ("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."). Plaintiffs have met their burden on this prong; they alleged the trade dress description with particularity

14

to provide sufficient notice to defendant. The SAC alleges three elements:

> (a) A rounded square transparent plastic bowl containing salad ingredients, particularly lettuce or other greens; (b) A companion transparent plastic insert containing a central receptacle to hold the salad dressing cup and several arcuate, segmental receptacles, positioned circumferentially around the central receptacle, each of the receptacles containing various colorful salad toppings; and (c) An elongated generally rectangular plastic band overwrap or sleeve the overwrap or sleeve being tensioned around the bowl, with said plastic band or sleeve overwrap containing a particular look and feel through its use of font, colors and overall design that provides a vertical billboard as well as allowing for all the salad toppings to be viewed without being obstructed by the band or sleeve.

SAC ¶ 56. The cases defendant cites concerned plaintiffs that left the door open to expand the trade dress claim at a later stage in the litigation. For example, the court in Salt Optics, Inc. v. Jand, Inc., No. SACV 10-0828 DOC, 2010 WL 4961702, at *5 (C.D. Cal. Nov. 19, 2010), noted that the plaintiff expressly stated that it intended to "incorporate other elements of the website into the trade dress claim at a later stage [of the litigation]." Unlike those cases, plaintiffs here have been consistent in arguing the same trade dress elements in the original complaint, the FAC, the SAC, and the opposition brief. The underlying concern of those cases was sufficient notice, which defendant has here.

In support of its second argument, defendant contends that plaintiffs have not carried their burden that trade dress protection does not extend to functional elements. Mtn. at 18–19. Of course, plaintiffs will need to offer sufficient factual evidence to demonstrate functionality; however, such a fact-intensive inquiry is not appropriate for a motion to dismiss. Autodesk, 2008 WL 6742224, at *2. This conclusion is consistent with the court's opinion denying defendant Fresh Express' motion to dismiss with regard to plaintiffs' trade dress infringement claim. This court determined that plaintiffs' allegations presented factual questions regarding functionality that could not be resolved at the motion to dismiss state. Dkt. 59 at 22. The same holding is applicable here.

       **ii.**    **Second and Third Elements: Secondary Meaning and Likelihood of Consumer Confusion**

The parties do not discuss the remaining two elements of an underlying trade dress infringement claim. The second element requires plaintiffs to allege that the claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning. Because defendant does not challenge this element and because secondary meaning is a question of fact (Clicks Billboards, 251 F.3d at 1262), the court assumes, but does not decide that plaintiffs have met this element. The third element requires that the defendant's product or service creates a likelihood of consumer confusion. Again, because defendant does not challenge the likelihood of consumer confusion, the court assumes, but does not decide that plaintiffs have met this element. Thus, plaintiffs have stated a plausible trade dress infringement.

### b. Contributory Trade Dress Infringement

Turning to the contributory trade dress infringement elements, defendant argues that plaintiffs' allegations still fail because they do not allege sufficient knowledge or intentional conduct to demonstrate inducement. Mtn. at 19. Plaintiffs respond that if a manufacturer creates a custom-designed product, then the manufacturer would know that a different customer purchasing the same custom-designed product is using that product for the same purpose. Opp. at 11. Defendant also contends that the product that it provides to Fresh Express is not an infringing product because it does not bear any resemblance to the purported trade dress and defendant's machinery does not contribute to making the trade dress elements. Mtn. at 19. Put differently, the trade dress elements, bowl, tray insert, and plastic overband or sleeve, are designed, manufactured, and sold by companies other than Proseal. Id. Plaintiffs respond that Fresh Express could not have used its infringing packaging without the seal created by defendant's machinery. Opp. at 11.

There are two ways to demonstrate contributory trade dress: intentional inducement or continuing to supply an infringing product to an infringer with the knowledge that the infringer is mislabeling the particular product. Perfect 10, 494 F.3d at 807. Plaintiffs are arguing the latter, i.e., that defendant knew about the infringement and

16

continued to supply its product. Plaintiffs' allegations that Proseal knew of Fresh Express' infringement are conclusory. For example, they allege "[a]s part of its efforts to misappropriate Five Star's products and packaging, Fresh Express convinced Proseal to sell them similar equipment and create a manufacturing tool that is virtually indistinguishable from the tool set used for Five Star's packaging equipment." SAC ¶ 24. There are no factual allegations to support these conclusory statements.

Plaintiffs also contend that the court should assume Proseal knew of the infringement because Proseal was familiar with Five Star's intellectual property and was asked to create a "virtually identical tool" for both companies. Opp. at 10. It is not clear that plaintiffs, who only have access to their own tool, can know with certainty that the tools are virtually identical. Even if the tools are identical, it is also not clear that Proseal's virtually identical tools can only be used with a singular, custom-designed package. Given these uncertainties and the conclusory nature of plaintiffs' SAC, plaintiffs have not demonstrated that defendant knew it was contributing to Fresh Express' alleged trade dress infringement.

In sum, plaintiffs have not alleged sufficient facts to demonstrate the requisite knowledge for a contributory trade dress infringement claim. For the foregoing reasons, defendant's motion to dismiss plaintiffs' sixth cause of action for active inducement of trade dress infringement as alleged against Proseal is GRANTED.

### 5. Seventh and Eighth Claims: Common Law and Statutory Unfair Competition

Plaintiffs bring two claims for violations of both common law and statutory unfair competition law. The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Bus. & Prof. Code. § 17200. Each "prong of the UCL [provides] a separate and distinct theory of liability." Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007); see also Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1169 (9th Cir. 1998) (discussing common law unfair competition). Plaintiffs' UCL claims do not allege any independent conduct beyond that alleged in the

17

other claims for relief. SAC ¶¶ 70–71, 78. Because the court finds that plaintiffs' other claims must be dismissed, the unfair competition law claims must likewise be dismissed. For the foregoing reasons, defendant's motion to dismiss plaintiffs' seventh and eighth causes of action for violations of the statutory and common law unfair competition as alleged against Proseal is GRANTED.

### 6. Ninth Claim: Breach of Contract

Plaintiffs' ninth claim is for breach of the non-disclosure agreement ("NDA") between Five Star and Proseal. To plead a claim for breach of contract under California law, plaintiffs must allege: "(1) existence of the contract; (2) [plaintiffs'] performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff[s] as a result of the breach." Appling v. Wachovia Mortg., FSB, 745 F. Supp. 2d 961, 974 (N.D. Cal. 2010) (quoting CDF Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (Ct. App. 2008)).

Neither party disputes the existence or validity of the mutual NDA as a binding contract. Additionally, neither party explicitly discusses plaintiffs' performance or excuse of performance. The dispositive question is whether defendant breached the contract by disclosing plaintiffs' confidential information to Fresh Express. The NDA, which is incorporated by reference to the SAC, defines "confidential information" broadly and does so intentionally. SAC, Ex. 1, ¶ 1 ("The parties hereto agree that it is their specific intent that the definition of Confidential Information be defined as broadly as possible within the permissible context of applicable law."). Further, the NDA imposes obligations on the parties not to disclose or make available confidential information to any third party unless an exception applies (i.e., the confidential information was in the public domain or the non-releasing party gave prior written authorization). Id. ¶¶ 2–3.

In many respects, the issue of confidential information tracks the parties' arguments regarding trade secrets. Similar to their trade secret misappropriation claim, plaintiffs contend that the confidential information at issue here is the information supplied by Five Star to Proseal during the back-and-forth collaboration and testing process

18

between the two companies. Opp. at 7. Defendant characterizes the confidential information at issue here as Proseal's own sealing technology, which, as it points out, does not belong to plaintiffs. Mtn. at 14. Defendant emphasizes that sharing confidential information does not create a license or vest a proprietary right, interest, or title in that confidential information. Further, the NDA makes clear that there is no exclusivity between the parties.

Without the Shoshan Declaration, the SAC fails to allege what constitutes confidential information with any particularity, similar to the court's conclusion with regard to plaintiffs' trade secret allegations. The lack of particularity makes it difficult to determine whether a breach occurred. Nor do plaintiffs allege direct knowledge of the breach. Instead, they ask the court to assume that because Fresh Express' packaging is virtually indistinguishable to Five Star's and because Proseal had "an opportunity and motive for using Five Star's information" (Opp. at 7), then Proseal breached its NDA obligation. These assumptions are not tenable. As discussed in regard to plaintiffs' contributory trade dress inducement claim, it is not clear that virtually indistinguishable packaging inexorably means that defendant used the exact same specifications on one product (Fresh Express') as it did on another (Five Star's). Further, it is equally plausible that defendant and Fresh Express configured their own toolset in the exact same method that defendant and Five Star arrived on their tool set: through a substantial back-and-forth process. Plaintiffs have not demonstrated a plausible disclosure of confidential information from Proseal to Fresh Express and, thus, no breach.

For the foregoing reasons, defendant's motion to dismiss plaintiffs' ninth cause of action for breach of contract as alleged against Proseal is GRANTED.

**7. Amendment Would Not Be Futile**

While the court does not consider the Shoshan Declaration for purposes of the motion to dismiss, there is relevant factual matter in the declaration that could be included in an amended complaint. At the hearing, plaintiffs' counsel proffered the declaration to demonstrate factual allegations that plaintiffs could add to an amended

complaint. Accordingly, the court finds that further amendment would not be futile.

**CONCLUSION**

In light of the foregoing, the court GRANTS defendant's motion to dismiss and all of plaintiffs' causes of action as alleged against Proseal America, Inc. are DISMISSED WITH LEAVE TO AMEND. While the court grants leave to amend, the schedule for filing an amended complaint will be set when the court issues an order in response to Fresh Express' pending motion to dismiss. Dkt. 72.

**IT IS SO ORDERED.**

Dated: March 16, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge